# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| JAMES MADISON PROJECT, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 17-1392 (ABJ) |
| ) | |
| DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM OPINION

Plaintiffs Josh Gerstein, a journalist, and The James Madison Project, an organization established "to promote government accountability," Compl. [Dkt. # 1] ¶ 3, brought this suit against the Department of Justice ("DOJ"), and the Federal Bureau of Investigation ("FBI"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.* They have requested records related to the question of "whether President Donald J. Trump is or ever was a target of, subject of, or material witness to any investigation." *Id.* ¶ 6. The government issued what is known as a "*Glomar* response,"[1] refusing to confirm or deny the existence of responsive records.

DOJ has moved for summary judgment, and plaintiffs opposed the motion and filed their own motion for partial summary judgment. They argue that the President waived the government's right to insist on confidentiality with a *Glomar* response by making a series of public statements,

_____

[1] The term "*Glomar* response" originates from the Central Intelligence Agency's ("CIA") refusal to confirm or deny the existence of records in response to a FOIA request relating to "the *Hughes Glomar Explorer*, a ship used in a classified [CIA] project 'to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts.'" *Roth v. DOJ*, 642 F.3d 1161, 1171 (D.C. Cir. 2011), quoting *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981).

including tweets, in which plaintiffs contend he officially acknowledged the existence of responsive records. Upon review of the full record, including the agency's affidavits, the parties' supplemental filings, and each of the alleged "official statements," the Court will grant defendant's motion for summary judgment, and it will deny plaintiffs' motion. The government has met its burden of establishing that the information withheld is protected under FOIA Exemption 7(A), and none of the President's statements satisfy the "stringent test required to establish . . . a waiver." *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 199 (D.C. Cir. 1993).

## BACKGROUND

On May 12, 2017, plaintiffs submitted a FOIA request to DOJ. Ex. A to Castellano Decl. [Dkt. # 11-2] ("FOIA Request"). They sought the following records "created, received and/or maintained by the Office of Attorney General ("AG"), the Office of the Deputy Attorney General ("DAG"), and/or the Office of the Associate Attorney General ("AAG")":

> (1) Any records memorializing discussions between Department of Justice ("DOJ") staff and FBI staff regarding whether President Trump is or ever was a target of, subject of or material witness to any investigation; and
>
> (2) Any records memorializing disclosures to President Trump or any White House staff regarding whether President Trump is or ever was a target of, subject of or material witness to any investigation;
>
> (3) Any records memorializing discussion among DOJ staff regarding the appropriateness of informing President Trump if he is or ever was a target of, subject of or material witness to any investigation; and
>
> (4) Any records memorizing [sic] discussion between DOJ staff and FBI staff regarding the appropriateness of informing President Trump if he is or ever was a target of, subject of or material witness to any investigation.

*Id.*

Plaintiffs asked for records from the period of January 1, 2016, to the date of DOJ's search.

*Id.* They submitted an identical FOIA request to the FBI, a component of DOJ, on May 12, 2017.

Ex. A to Hardy Decl. [Dkt. # 11-1] ("FOIA Request"). As part of their request, plaintiffs advised the agencies that the letter in which President Trump terminated then-FBI Director James Comey "stated that Director Comey had informed him on three separate occasions that he (President Trump) was not under investigation." FOIA Request at 1. The requestors also noted that in a subsequent interview with NBC News, the President stated that he asked Comey, "[A]m I under investigation?" and that Comey responded, "You are not under investigation." *Id.* at 1–2.

On June 20, 2017, the FBI issued its *Glomar* response asserting that the agency could "neither confirm nor deny the existence of any records" responsive to plaintiffs' request pursuant to FOIA Exemptions 7(A) and 7(E). Ex. C to Hardy Decl. [Dkt. # 11-1]. Plaintiffs administratively appealed this decision, but the agency's final response was affirmed. Ex. D to Hardy Decl. [Dkt. # 11-1]; Ex. C to Hardy Decl. [Dkt. # 11-1]. The DOJ did not issue a separate response to the same FOIA request. Compl. ¶ 22.

On July 14, 2017, plaintiffs filed a two-count complaint against DOJ. *See* Compl. In count one, plaintiffs challenged DOJ's failure to respond to their request, and in count two they challenged the FBI's response. *Id.* ¶¶ 23, 32. After the suit was filed, DOJ responded by also issuing a *Glomar* response, based solely on FOIA Exemption 7(A). Ex. C to Castellano Decl. [Dkt. # 11-2].

Defendant moved for summary judgment, arguing that its *Glomar* response was justified under FOIA Exemption 7(A) and that the existence of responsive records had not been officially acknowledged. Def.'s Mot. for Summ. J. [Dkt. 11] ("Def.'s Mot."). Plaintiffs then cross-moved for partial summary judgment and identified additional statements from President Trump which they argued waived the DOJ's *Glomar* response. Pls.' Cross. Mot. for Partial Summ. J. [Dkt. # 13]; Pls.' Mem. in Supp. of Pls.' Mot. [Dkt. # 13-1], (collectively, "Pls.' Cross-Mot.").

After the motions were fully briefed, plaintiffs moved to supplement the factual record with more statements, including tweets, from President Trump which they contend constitute additional official disclosures. *See* Mot. For Leave to Suppl. the Factual Record [Dkt. # 21] ("First Factual Suppl."); Mot. For Leave to Suppl. the Record [Dkt. # 22] ("Second Factual Suppl."); Mot. for Leave to Suppl. the Record [Dkt. # 24] ("Third Factual Suppl."); Mot. for Leave to Suppl. the Record [Dkt. # 25] ("Fourth Factual Suppl.").[2] Most recently, plaintiffs filed motions to again supplement the record with additional statements from the President and they also requested oral argument. Mot. for Leave to Suppl. the Record and for Oral Argument [Dkt. # 28] ("Fifth Factual Suppl."); Mot. for Leave to File Suppl. the Record [Dkt. # 29] ("Sixth Factual Suppl."). The Court granted the motions to supplement, but it has determined that there is no need for oral argument.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary

---

2       The Court permitted plaintiffs to supplement the record multiple times, but it cautioned that the "ruling[s] should not be interpreted as a determination by the Court that these general statements, or any other statements by the President that have been brought to the Court's attention in this case, are in fact material or that they constitute an official disclosure of the existence or non-existence of records responsive to the particular FOIA request in this case." Min. Order (Jan. 30, 2018); *see also* Min. Order (Mar. 1, 2018); Min. Order (May 7, 2018); Min. Order (June 8, 2018).

judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Id.*, at 247–48. A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

FOIA cases are typically and appropriately decided on motions for summary judgment. *Brayton v. Office of the U.S. Trade Rep.,* 641 F.3d 521, 527 (D.C. Cir. 2011). In FOIA cases, the agency bears the ultimate burden of proof. *See DOJ v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). The Court may award summary judgment based solely on information provided in an agency's affidavits or declarations that identify "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). These affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).

## ANALYSIS

FOIA requires government agencies to release records upon request in order to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The statute provides that: "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless the records fall within one of nine narrowly construed exemptions. *See* 5 U.S.C. § 552(b); *FBI v. Abramson*, 456 U.S. 615, 630 (1982). This framework "represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003). When an agency withholds documents or parts of documents, it must explain what it is withholding and the statutory exemptions that apply. *See Vaughn v. Rosen,* 484 F.2d 820, 825–28 (D.C. Cir. 1973).

In some instances, however, the government may refuse to even confirm or deny the existence of responsive records. *Wolf v. CIA.*, 473 F.3d 370, 374 (D.C. Cir. 2007). This is called a "*Glomar* response." Such a response is appropriate when revealing the very fact that an agency possesses responsive records would itself "cause harm cognizable under [a] FOIA exception." *Id.*, *quoting Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982) (internal quotation marks omitted).

To justify a *Glomar* response, the agency must supply the court with a detailed affidavit that explains why it cannot provide a substantive response pursuant to a FOIA exemption. *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012). To determine whether a *Glomar*

response "fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374.

## I.    FOIA Exemption 7(A)

FOIA Exemption 7(A) permits agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

Plaintiffs do not dispute that the information sought is covered by this exemption. Instead, they argue that the executive branch has waived its right to assert the exemption as the basis for its *Glomar* response because the existence of responsive records has already been disclosed through official statements. *See* Pls.' Cross-Mot. at 5–13. Nonetheless, an agency bears the ultimate burden of proving that a FOIA exemption applies, *Tax Analysts*, 492 U.S. at 142 n.3, so the Court will begin its analysis there before moving on to the question of whether the exemption has been waived.

To justify the withholding of records under Exemption 7(A), DOJ must "demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'" *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) ("*CREW*"), quoting *Mapother v. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993). In creating the exemption, Congress recognized that "law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case." *CREW*, 746 F.3d at 1096, *quoting Robbins Tire & Rubber Co.*, 437 U.S. at 224.

The FBI's declarant confirmed that on March 20, 2017, the then-FBI Director, James Comey, testified before the House Permanent Select Committee on Intelligence ("HPSCI") that the agency was

> investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any link between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts.

Hardy Decl. [Dkt. # 11-1] ¶ 19.[3]  But at that time, the FBI Director cautioned that "[b]ecause it is an open, ongoing investigation and is classified, I cannot say more about what we are doing and whose conduct we are examining."  *Id.*

The FBI's declarant avers that the "Russia investigation" is still ongoing, so to the extent plaintiffs' request can be interpreted as a request for records pertaining to that effort, merely confirming the existence of responsive records could significantly hamper the investigation.  *Id.* ¶¶ 20–21.

> [O]fficial confirmation of who is or who is not considered a subject or witness in an investigation would also alert others – including other potential subjects and witnesses – about the focus and scope of the investigation, which could influence their behavior and testimony in ways that adversely affects the investigation.  Specifically, it would arm them with valuable information necessary to alter or offensively structure their testimony, and also to take defensive actions to conceal their activities, elude detection, and destroy, adulterate, or fabricate evidence.  It would also expose any potential witnesses or sources to harassment, intimidation, or coercion.  This is true regardless of whether or not responsive records exist. That is, regardless of whether a particular individual is or is not subject or witness in the pending investigation, such information provides those intent on interfering with the investigation additional pieces of information necessary to target their behaviors in such a way as to maximize the effect of any efforts to undermine the investigation.

---

[3]     Citing, James B. Comey, Statement Before the HPSCI, Russian Active Measures Investigation,  https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation ("Comey Congressional Testimony").

*Id.* ¶ 26.

The FBI declarant adds that if plaintiffs' request is interpreted to extend beyond the Russia investigation, it would relate to a pending investigation that the agency has not publicly acknowledged. *Id.* ¶ 27. The agency asserts that prematurely revealing an investigation carries the same risks identified above and could ultimately interfere with the agency's ability to determine whether a crime was committed. *Id.* In further support of the motion for summary judgment, DOJ submitted a similar declaration. *See* Castellano Decl. [Dkt. # 11-2] ¶¶ 12–13.

Based on the Court's review of defendant's declarations, it concludes that the agency has supplied sufficient information to support its claim that merely revealing whether or not responsive records exist would give rise to a risk of interference with law enforcement proceedings that are pending or reasonably anticipated; therefore, a *Glomar* response is justified under Exemption 7(A). *See CREW,* 746 F.3d at 1096; 5 U.S.C. § 552(b)(7)(A).

## II.    The Official Acknowledgment and Public Domain Doctrine

Once the defendant has met its burden of establishing that the FOIA exemption applies, the burden shifts to plaintiffs to prove that the government waived its right to invoke the exemption through a prior official statement. *See Pub. Citizen*, 11 F.3d at 201.

It is well established that a FOIA plaintiff may compel disclosure of information "even over an agency's otherwise valid exemption claim" if the government previously "officially acknowledged" the information. *ACLU v. DOD*, 628 F.3d 612, 620 (D.C. Cir. 2011). The rationale behind the doctrine is that once information has become public, any damage the agency fears from disclosure has already been sustained. *See Niagara Mohawk Power Corp. v. U.S. Dep't of Energy,* 169 F.3d 16, 19 (D.C. Cir. 1999). This is commonly referred to as an "official

acknowledgement" challenge or the "public domain exception." *See ACLU v. CIA,* 710 F.3d at

422, 426–27 (D.C. Cir. 2013) (using the terms interchangeably) ("*ACLU*").

A plaintiff mounting this type of challenge "bears the initial burden of pointing to specific

information in the public domain that duplicates that being withheld." *Pub. Citizen*, 11 at 201; *see

also Mobley v. CIA.*, 806 F.3d 568, 583 (D.C. Cir. 2015) (same).

The D.C. Circuit has imposed a "strict test" to be applied to claims of official disclosure.

*Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011). Information is officially acknowledged by

an agency where: (1) "the information requested [is] as specific as the information previously

released," (2) the requested information "match[es] the information previously disclosed," and (3)

the requested information was already "made public through an official and documented

disclosure." *Fitzgibbon v. CIA,* 911 F.2d 755, 765 (D.C. Cir. 1990).

In *Glomar* cases, however, a plaintiff need not show that that the actual contents of the

particular records sought have been disclosed; rather they must establish that the agency has

previously acknowledged the fact of the *existence* of responsive records. *Marino v. DEA*, 685 F.3d

1076, 1081 (D.C. Cir. 2012).

The D.C. Circuit has articulated the official acknowledgment test in *Glomar* cases as

follows:

> [I]f the prior disclosure establishes the *existence* (or not) of records
> responsive to the FOIA request, the prior disclosure necessarily matches
> both the information at issue – the existence of records – and the specific
> request for that information.

*Wolf*, 473 F.3d at 379. This standard has been reaffirmed by the D.C. Circuit in subsequent *Glomar*

cases. *See Moore*, 666 F.3d at 1333 (holding that a plaintiff must "pinpoint an agency record that

both matches the plaintiff's request and has been publicly and officially acknowledged by the

agency."); *see also Mobley v. CIA.*, 806 F.3d 568, 583 (D.C. Cir. 2015) (re-stating the three-part *Fitzgibbon* official acknowledgement test).

The D.C. Circuit has repeatedly emphasized the importance of the applying this test with rigor, because "the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption." *Wolf,* 473 F.3d at 378, citing *Fitzgibbon,* 911 F.2d. at 766. Therefore, "[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Morley v. CIA.,* 508 F.3d 1108, 1124 (D.C. Cir. 2007) (emphasis in original).

If a court determines that a *Glomar* response has been waived because the information was previously officially acknowledged, then the government must either: "(1) disclose the record to the requester or (2) establish that its contents are exempt from disclosure and that such exemption has not been waived." *Moore*, 666 F.3d at 1333. In other words, a failed *Glomar* response "does not mark the end" of a case. *ACLU,* 710 F.3d at 432. Instead, the case is remanded to the agency to process the FOIA request and assert any exemptions to disclosure on a document by document based on their content. *Wolf,* 473 F.3d at 379–80.

## III.    The Statements

Plaintiffs do not point to any statements issued by the FBI or DOJ that explicitly acknowledge that the agency has records on whether President Trump was or is a target, subject, or material witness of an investigation. Indeed, the only official statement in the record made by the FBI is the March 2017 Congressional testimony of then-Director Comey, in which he expressly declined to provide details on the Russia investigation, much less whether any particular individuals had been designated to be targets, subjects, or witnesses: "Because it is an open,

ongoing investigation and is classified, I cannot say more about what we are doing and whose conduct we are examining." Comey Congressional Testimony.

Plaintiffs base their case solely on statements made by President Trump, including some of his early morning tweets. Plaintiffs invite the Court to conclude that responsive records exist based on the President's summaries of conversations he had with the former FBI director as well as a number of vague, and sometimes hostile, comments made on social media concerning the investigation.

The D.C. Circuit has recognized that a President may be capable of waiving an agency's *Glomar* response in some circumstances. Although typically a "[d]isclosure by one federal agency does not waive another agency's right to assert a FOIA exemption," *Mobley*, 806 F.3d at 583, a prior disclosure "made by an authorized representative of the agency's parent," including the President, can trigger a waiver. *ACLU*, 710 F.3d at 426 n.7.[4] However, this does not mean that any statement from the President automatically waives an agency's *Glomar* response. The Court

---

4       Three recent district court cases from this Circuit have interpreted this footnote to mean that the President can waive an agency's *Glomar* response because he is the head of the executive branch. *Judicial Watch, Inc. v. DOJ*, 293 F. Supp. 3d 124, 128 n.4 (D.D.C. 2018) (noting that although the official disclosure must come from the specific agency the FOIA request was made to, "the D.C. Circuit has stated that an acknowledgment of records' existence by a parent agency – such as the President as head of the Executive Branch – is imputed to its component agencies"), citing *ACLU*, 710 F.3d at 429 n.7; *James Madison Project v. DOJ*, 302 F. Supp. 3d 12, 24 (D.D.C. 2018), *recons. denied in part*, 17-CV-00144, 2018 WL 3956426 (D.D.C. Aug. 16, 2018) ("The D.C. Circuit has recognized that '[a] disclosure made by the President, or by [an] advisor acting as instructed by the President,' is attributable to executive branch agencies for purposes of the official acknowledgement doctrine.") (internal quotation marks omitted), quoting *ACLU*, 710 F.3d at 429 n.7; *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 57 (D.D.C. 2015) (noting that NSA rightfully concedes, based on case law, that the President's statement to the press and administration's white paper were attributable to the NSA), citing *ACLU*, 710 F.3d at 429 n.7.

In each of these cases, however, the court found that the President's statement had not waived the agency's *Glomar* response because the statement failed to meet the three criteria of the official disclosure test.

must consider whether the President's statement meets the other requirements of the official acknowledgment test, including the rule that the information publicly disclosed must "match" the information sought in the request. *Fitzgibbon*, 911 F.2d at 765.

Plaintiffs bear the burden of overcoming the government's *Glomar* response by pointing to the "specific information in the public domain that duplicates that being withheld," *Pub. Citizen*, 11 F.3d at 201, and here, they have directed the Court's attention to twelve statements by the President which they describe as relating to the "Russian collusion" investigation or the alleged "obstruction of justice" investigation. Pls.' Cross-Mot. at 4. Based on the individual analysis to be set forth below, the Court finds that none of the statements identified by the plaintiffs satisfy the stringent legal test for an official acknowledgment. No statement explicitly acknowledges the existence of responsive records within the FBI or DOJ, and none of them "match" the information sought in the FOIA request. Moreover, the Court cannot infer that the President based any of his assertions on FBI and DOJ records because he makes no reference to any such material in his statements, *Moore*, 666 F.3d. at 1333, and none of the statements provided are "tantamount to an acknowledgment" that the FBI or DOJ has responsive records. *ACLU*, 710 F.3d at 431.[5]

### 1. May 9, 2017 Statement in Comey Termination Letter

Plaintiffs point to President Trump's May 9, 2017 letter to former FBI Director James Comey. In terminating the Director from his position, the President declared:

> While I greatly appreciate you informing me, on three separate occasions, that I am not under investigation, I nevertheless concur with the judgment of the Department of Justice that you are not able to effectively lead the Bureau.

---

5       The Court does not need to reach the question of whether a Presidential statement on Twitter, standing alone, can or should be deemed to be an official statement by the executive branch for these purposes, since the tweets identified fall far short of being official acknowledgments for other reasons.

Pls.' Cross-Mot. at 5.[6]

This sentence implicitly asserts that there were certain exchanges between the then FBI director and the President concerning the investigation, but the highly summary introductory clause does not provide any details on how information was transmitted or what was communicated. There is no mention of any "agency record" or written memorandum that was shared with the President or was referenced in the conversation. *See Moore*, 666 F.3d at 1333. Moreover, the general phrase "not under investigation" does not mirror the specificity of the request, which seeks records on whether the President "is or ever was a target of, subject of

---

6        Citing, *Trump's letter firing FBI Director James Comey*, CNN (May 10, 2017), https://www.cnn.com/2017/05/09/politics/fbi-james-comey-fired-letter/index.html.

or material witness."[7] FOIA Request. These terms have specific meaning that is not captured by the President's language. Plaintiffs contend that this is an "overly-literal" interpretation, Pls.' Cross-Mot. at 10, but the "insistence on exactitude" is what the official acknowledgment doctrine demands. *Wolf*, 473 F.3d at 378.

Plaintiffs acknowledge that the specificity requirements articulated in *Wolf* govern this case, but they argue that the D.C. Circuit's ruling in *ACLU* established some "latitude" on how strictly to apply the test. Pls.' Reply in Supp. of Pls.' Cross-Mot. [Dkt. # 17] ("Pls.' Cross-Reply") at 3. They contend that the *ACLU* ruling permits courts to "infer" the existence or non-existence of responsive records, even when the official disclosure does not specifically mention any records,

---

7     The President's statements do not speak in terms of "target, subject, or material witness" at all. The terms "target" and "subject" are terms of art that are used in federal law enforcement investigations, and they have specific definitions that are set out in the U.S. Attorneys' Manual § 9-11.151:

> A "target" is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant. An officer or employee of an organization which is a target is not automatically considered a target even if such officer's or employee's conduct contributed to the commission of the crime by the target organization . . .

> A "subject" of an investigation is a person whose conduct is within the scope of the grand jury's investigation.

Plaintiffs use the words loosely, and they appear to be unaware that the third category should probably be "witness," not "material witness." The term "material witness" is not defined in this portion of the USAM, and it is a designation that serves an entirely different purpose and appears to have no applicability to the investigation at issue in this case, though it appears in the Bail Reform Act. *See* 18 U.S.C. § 3144 ("If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of section 3142 of this title."); *see also* Fed. R. Crim. P. 15(a)(2).

A "witness," in the context of law enforcement investigations, on the other hand, can include an individual who is summoned to testify before a grand jury.

if to conclude otherwise would be "neither logical nor plausible." *Id.*

While the D.C. Circuit's opinion in the *ACLU* case does indicate that a court may infer the existence or non-existence of records from an official statement in certain situations, this is not one of those situations. In *ACLU,* the plaintiffs sought the release of records from the CIA regarding the operation of drones by the CIA and Armed Forces, and the agency invoked a *Glomar* response. 710 F.3d at 425, 427. The agency argued that it had never officially disclosed the existence of any records that would show whether the CIA in particular had any involvement or interest in the drone strikes in question, and it explained that it invoked *Glomar* to avoid either confirming or denying that interest. *Id.* at 430–431. The D.C. Circuit Court found that public statements made by the President of the United States (in a live internet forum), the President's counter-terrorism advisor (in a public speech), and the Director of the CIA (in a public speech) officially disclosed the existence of the CIA's interest in drones, making the CIA's *Glomar* response illogical. *Id.* at 429–31. Because the statements made by the President, the counter-terrorism advisor, and, especially, the CIA Director were so specific,[8] the Court found that they were "tantamount to an acknowledgment that the CIA has documents" matching the plaintiffs' request, making it "neither logical nor plausible to maintain that the Agency does not have any documents relating to drones." *Id.* at 431 (internal quotation marks omitted).

Here, both the substance of the President's official statement and the context is distinguishable. First, the statements that formed the basis for the finding in *ACLU* were lengthy and highly specific. Second, in this case, the government's justification for withholding

---

[8]     When asked about remote drone strikes, the then-Director of the CIA stated, "because these are covert and secret operations I can't go into particulars. I think it does suffice to say that these operations have been very effective because they have been very precise in terms of the targeting . . . I can assure you that in terms of a particular area, it is very precise." *ACLU*, 710 F.3d at 430.

information is not merely based on a desire to keep its "interest" in the subject matter confidential; the agency has identified the particular harms that could flow from revealing the specific information sought – the "identities of subjects or witnesses, or the scope" of the ongoing Russia investigation. Hardy Decl. ¶¶ 23–25; *see also* Castellano Decl. ¶¶ 13–14. Third, the Court in *ACLU* relied on a combination of statements, including those made by the President, but it placed a particular emphasis on the public statements made by the CIA itself.[9] *See ACLU*, 710 F.3d at 431. Here, plaintiffs rely solely on statements made by the President, and none from the DOJ or the FBI. This difference bears upon the resolution of the official acknowledgment question in this case because in several of the statements, the President appears to be speaking in opposition to, rather than on behalf of, the investigation itself and the agencies involved.

So while a President may be included among the executive branch officials who can waive the confidentiality needed to sustain an agency's *Glomar* response, it is still necessary that any statement proffered meet the matching and specificity requirements. When a plaintiff asks a court to take the extraordinary step of looking past the fact that an official statement does not on its face reveal whether responsive records exist, then it is imperative that both the context and substance of the official disclosures "leave no doubt" as to that fact, *see ACLU,* 710 F.3d at 429,

---

9       After quoting the CIA director's remarks, the Court in *ACLU* reasoned:

> [T]he Director spoke directly about the precision of targeted drone strikes, the level of collateral damage they cause, and their usefulness in comparison to other weapons and tactics. Given those statements, it is implausible that the CIA does not possess a single document on the subject of drone strikes. Unless we are to believe that the Director was able to "assure" his audience that drone strikes are "very precise and . . . very limited in terms of collateral damage" without having examined a single document in his agency's possession, those statements are tantamount to an acknowledgment that the CIA has documents on the subject.

*ACLU*, 710 F.3d at 431.

and that the public statements are "tantamount to an acknowledgment that the [agency] had documents on the subject." *Id.* at 431. The President's summary reference to what he may have been told by Director Comey does not meet that high bar.

## 2. May 11, 2017 NBC News Interview

Plaintiffs have also pointed to excerpts from the President's May 11, 2017 interview with NBC reporter Lester Holt. During the conversation, the President was asked about the termination of the FBI Director two days before:

> LESTER HOLT: Let me ask you about your termination letter to Mr. Comey. You write: *"I greatly appreciate you informing me on three separate occasions that I am not under investigation."* Why did you put that in there?
>
> DONALD TRUMP: *Because he told me that. I mean he told me it.*
>
> LESTER HOLT: He told you weren't under investigation [OVER TALK] regardless –
>
> DONALD TRUMP: Yeah and I've – I've heard that from others I think –
>
> LESTER HOLT: Was it in a phone call, did you meet face to face?
>
> DONALD TRUMP: Uh, I had a dinner with him. He wanted to have dinner because he wanted to stay on. We had a very nice dinner at the White House [OVER TALK]
>
> LESTER HOLT: He asked for the dinner?
>
> DONALD TRUMP: A dinner was arranged, I think he asked for the dinner. And he wanted to stay on as the FBI head. And I said I'll, you know, consider and we'll see what happens – But we had a very nice dinner. And at that time, he told me you are not under investigation. [OVER TALK]
>
> LESTER HOLT: That was –
>
> DONALD TRUMP: Which I knew anyway.
>
> LESTER HOLT: That was one meeting. What was it, what were the other two? [OVER TALK]

DONALD TRUMP: First of all, when you're under investigation, you're given all sorts of documents and everything. I knew I wasn't under and I heard it was stated at the committee, at some committee level, that I wasn't. Number one.

LESTER HOLT: So that didn't come directly from him?

DONALD TRUMP: [OVER TALK] Then during a phone call he said it. And then during another phone call he said it. So he said it once at dinner and then he said it twice during phone calls.

LESTER HOLT: Did you call him?

DONALD TRUMP: Uh, in one case I called him and one case he called me.

LESTER HOLT: And did you ask, "Am I under investigation?"

DONALD TRUMP: I actually asked him, yes. *I said, "If it's possible, would you let me know am I under investigation?" He said you are not under investigation.*

LESTER HOLT: But he's, he's given sworn testimony that there is an ongoing investigation into the Trump campaign and possible collusion with the Russian government? *You were the centerpiece of the Trump campaign so [OVER TALK] was he being truthful when he says you weren't under investigation?*

DONALD TRUMP: [OVER TALK] *Well, all I can tell you is, well I know what, I know that I'm not under investigation. Me. Personally.* I'm not talking about campaigns. I'm not talking about anything else. I'm not under investigation.

Pls.' Cross-Mot. at 7 (emphasis in original).[10]

The President's statements provide more details on the "three occasions" referenced in the termination letter. He asserts that Comey told him he was not "under investigation" once at a dinner and during two phone calls. But again, none of these statements summarizing conversations with the FBI official explicitly refer to the existence of any record within the agency, or necessarily

---

10  Citing, *Partial transcript: NBC New Interview with Donald Trump,* CNN (May 11, 2017), https://www.cnn.com/2017/05/11/politics/transcript-donald-trump-nbc-news/index.html   ("NBC Interview Transcript").

imply the existence of such records.[11]  And the President's vague references to what he had heard

from "others" and what was said at "some committee level" as part of the basis for his belief that

he is not under investigation muddy the waters and do not point to the existence of responsive

records within the FBI or DOJ.  NBC Interview Transcript.

Because plaintiffs did not "pinpoint an agency record that both matches the plaintiff's

request and has been publicly and officially acknowledged by the agency" the Court finds that the

President did not waive defendant's *Glomar* response during the televised interview.  *Moore*, 666

F.3d at 1333.  The Court also finds that *ACLU* is inapplicable here for the reasons stated above

and declines to draw inferences from this insubstantial record on whether responsive records exist.

Based on these statements it does not inexorably follow that the FBI and DOJ possess records on

whether the President is or ever was the subject of, target of or material witness to a DOJ

investigation.[12]

---

11      Indeed, the President seems to suggest that he knows he is not under investigation because he was *not* provided with records: "First of all, when you're under investigation, you're given all sorts of documents and everything."  NBC Interview Transcript.

12      The same reasoning applies to the statement plaintiffs recently identified concerning the President's August 30, 2018 tweet: "The only thing James Comey ever got right was when he said that President Trump was not under investigation!"  Pls.' Fifth Factual Suppl.  Because the statement does not expressly identify a record, does not mirror the information sought in the request, *see Wolf*, 473 F.3d at 378–79, and is not "tantamount to an acknowledgment" that the agency has documents, the Court finds that it does not constitute an official acknowledgment. *ACLU,* 710 F.3d at 431.

### 3. July 19, 2017 *New York Times* Interview

Plaintiffs assert that the President "reiterated" that he was not being "personally investigated" in a July 19, 2017 interview with the *New York Times* in which he said with respect to "the Russian investigation," "it's not on me." Pls.' Cross-Mot. at 7.[13]

This vague statement, plainly does not match the information sought in the FOIA request, *Fitzgibbon*, 911 F.2d at 765, nor does it acknowledge or clearly implicate the existence of responsive records housed within the FBI or DOJ.

### 4. October 20, 2017 Statement to Reporters

The next statement fails for similar reasons. Plaintiffs assert that on October 20, 2017, President Trump told reporters that "he had not been asked by Special Counsel Robert Mueller to be interviewed as part of any investigation." Pls.' Cross-Mot. at 8.[14] This statement does not begin to align with the FOIA request, and it does not reveal the existence of the particular records sought.

And in fact, the statement quoted in the article is even more vague than that. The article reports that when a reporter asked the President if he would do an interview with the Special Counsel, he responded, "I don't know. I mean – nobody's asked me to do that." The Hill Article. This vague statement asserting a lack of personal knowledge, which concerns a request to be interviewed and not a formal designation as a target, subject, or witness, and makes no reference to a specific record that might match the FOIA request, does not begin to meet the "stringent test required" to establish a waiver. *Pub. Citizen*, 11 F.3d at 199.

---

13    Citing, *Excerpts from The Time's Interview with Trump*, N.Y. Times (July 19, 2017), https://www.nytimes.com/2017/07/19/us/politics/trump-interview-transcript.html.

14    Citing, Jesse Byrnes, *Trump: 'I don't know' if I'll interview with Mueller for Russia probe*, The Hill (Oct. 20, 2017), http://thehill.com/homenews/administration/356481-trump-i-dont-know-if-ill-interview-with-mueller ("The Hill Article").

### 5. June 9, 2017 Press Statement

Plaintiffs have also supplied statements they allege are related to an "obstruction of justice" investigation against the President which the FBI has neither confirmed nor denied. Pls.' Cross-Mot. at 8. They cite a June 9, 2017, press statement from President Trump asserting that "he would be willing to testify under oath about the conversations he had with Director Comey prior to firing him on May 9, 2017." Pls.' Cross-Mot. at 8.[15]

Plaintiffs' rush to inform the Court of every Presidential utterance such as this was not well-advised. There is obviously no "match" between this statement and the information sought; at best, the statement recognizes that the conversations with Comey may be a subject of an inquiry. The statement to the press expressing a willingness to "testify" is just that, and it does not constitute an official statement revealing the existence of records relating to whether he "is or ever was a target of, subject of or material witness to any investigation." FOIA Request.

### 6. June 16, 2017 Tweet

Plaintiffs point to a June 16, 2017 tweet in which the President exclaims:

> I am being investigated for firing the FBI director by the man who told me to fire the FBI Director! Witch hunt

Pls.' Cross-Mot. at 8.[16]

Plaintiffs claim that this tweet officially acknowledged the existence of the "obstruction of justice investigation" against the President. Pls.' Cross-Reply at 13. But they have conceded that the President "exclusively" relied on a *Washington Post* article published two days earlier when

---

15    Citing, Dan Merica, *Trump: I'm willing to testify under oath about Comey Claims*, CNN (June 9, 2017), https://www.cnn.com/2017/06/09/politics/trump-news-conference/index.html.

16    Citing, Donald Trump (@realDonaldTrump), Twitter (Jun. 16, 2017, 6:07 AM), https://twitter.com/realdonaldtrump/status/875701471999864833.

he made this declaration. Pls.' Resp. to Def.'s Notice of Suppl. Auth. [Dkt. # 19] at 4.[17] And that article in turn relied on unnamed sources to report that the Special Counsel was allegedly investigating the President for obstruction. Since the President's statement does not explicitly mention any records, and plaintiffs ruled out the possibility that it was even premised on government information, let alone DOJ or FBI records, the statement cannot be read as disclosing the existence of responsive records.

The law is clear that "an agency's official acknowledgement of information by prior disclosure . . . cannot be based on mere public speculation, no matter how widespread." *Wolf*, 473 F.3d at 378, citing *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). This is true even when that speculation is repeated (or re-tweeted) by the President. By acknowledging that the President was responding to the *Washington Post* article when he expressed his shock and disbelief, and that he was not broadcasting government information, plaintiffs have conceded that the President's statement cannot be deemed to be an official waiver. As the D.C. Circuit has advised, "it is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position

---

[17]     Citing, Delvin Barrett, *Special Counsel is investigating Trump for possible obstruction of justice, officials say*, Wash. Post (Jun. 14, 2017), https://www.washingtonpost.com/world/national-security/special-counsel-is-investigating-trump-for-possible-obstruction-of-justice/2017/06/14/9ce02506-5131-11e7-b064-828ba60fbb98_story.html?utm_term=.385adbb1ea0b.

to know of it officially to say that it is so." *Fitzgibbon*, 911 F.2d at 765.[18] Because the President's tweet amounts to speculation, it does not overcome defendant's *Glomar* response.

After filing their cross-motion, plaintiffs supplemented the factual record with six additional statements which they argue waived the government's *Glomar* response as it relates to what they label as the "Russian collusion" and the "obstruction of justice" investigations. First Factual Suppl. at 3.

### 7. January 24, 2018 Press Statements

On January 24, 2018, President Trump engaged in the following discussion with reporters regarding the Special Counsel's investigation:

> REPORTER: Are you going to talk to Mueller?
>
> TRUMP: I'm looking forward to it, actually.
>
> REPORTER: Do you have a date set? Do you have a date set, Mr. President?
>
> TRUMP: There's been no collusion whatsoever. There's no obstruction whatsoever. And I'm looking forward to it . . .
>
> REPORTER: Do you have a date set, Mr. President?
>
> TRUMP: I don't know, no. I guess you're talking about two or three weeks, but I would love to do it.
>
> REPORTER: In person?
>
> TRUMP: You know, again, it's — I have to say — subject to my lawyers and all of that — but I would love to do it . . .

---

18      Plaintiffs contend that the Court has "the discretionary authority to incorporate by reference unofficial disclosures that have been officially acknowledged," so it should incorporate by reference the June 14, 2017 *Washington Post* article into the President's tweet. Cross-Reply at 7–11. Plaintiffs do not cite to any legal authority in support of their novel argument, and the Court is disinclined to presume to flesh out the President's expressions of his own thoughts. In any event, the Court has already explained that media accounts cannot overcome the government's *Glomar* response.

TRUMP: Because here's what we'll say, and everybody says: No collusion. There's no collusion. Now they're saying, "Oh, well, 'Did he fight back? Did he fight back?' You fight back, 'Oh, it's obstruction.' So, here's the thing: I hope so.

REPORTER: How do you define collusion? Maggie asked this earlier during the briefing to Sarah –

TRUMP: You're going to define it for me, OK? But I can tell you, there's no collusion. I couldn't have cared less about Russians having to do with my campaign.

First Fact Suppl. at 2–3.[19]

Plaintiffs argue that these disclosures, "confirm the existence of records responsive to the Plaintiffs' FOIA requests, specifically in so much as they verify the existence of records memorializing discussions within DOJ and disclosures to President Trump (or his legal team) regarding the extent to which he is a subject or target of either of the two aforementioned investigations." *Id.* at 3.

This is a highly unpersuasive characterization of the President's pronouncements, which say nothing of the sort. In this interview, the President reiterates his personal desire to speak with the Special Counsel and his position concerning what took place during the campaign. The statements do not "match" the plaintiffs' specific record request; they do not bear on the question of whether the President is a target, subject, or material witness in an investigation. Furthermore, President Trump's unremarkable statement that the setting of a date for any meeting with the Special Counsel would be "subject to [his] lawyers" does not expressly acknowledge the existence of records memorializing disclosures from the DOJ to the President's legal team about his status.

---

19      Citing, *Trump audio transcript: 'I'm Looking forward to' speaking with Mueller*, Wash. Post. (Jan. 24, 2018), https://www.washingtonpost.com/news/post-politics/wp/2018/01/24/trump-audio-transcript-im-looking-forward-to-speaking-with-mueller/?utm_term=.3c9d96fc8edd.

Furthermore, the statements are too vague and ambiguous to warrant an *ACLU* type of analysis. *See generally ACLU*, 710 F.3d 422. When the President refers to what "they" are saying, it is not at all clear whether he is referring to law enforcement personnel or media commentators. This statement bears no resemblance to the CIA Director's statements about military technology which were so detailed, they were deemed by the Court of Appeals to be "tantamount to an acknowledgment that the CIA has documents on the subject." *Id.*

### 8. February 24, 2018 Release of HPSCI Memorandum

Next, plaintiffs argue that a memorandum drafted by the minority staff of the House Permanent Select Committee on Intelligence ("HPSCI") constitutes an official acknowledgement of the information at issue. Second Factual Suppl. at 3. The memorandum, titled "Correcting the Record-The Russia Investigation," but referred to by plaintiffs as the "Schiff Memo," was written in response to a memorandum drafted by the majority members of the committee, referred to as the "Nunes Memo." *Id.* at 2. The Schiff Memo was declassified by the President on February 24, 2018. *Id.* Plaintiffs point to a single line of the Schiff memo: "FISA was not used to spy on [President] Trump or his campaign," which they argue constitutes an official acknowledgment of the "existence or *non-existence* of records" sought in their FOIA request. *Id.* at 3. (emphasis in original).

A memorandum issued by members of a House Committee cannot constitute an official disclosure on behalf of the FBI and DOJ. The D.C. Circuit has explicitly stated that "[d]isclosure by one federal agency does not waive another agency's right to assert a FOIA exemption," and by extension a *Glomar* response. *Mobley*, 806 F.3d at 583; *see also Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999) ("[W]e do not deem 'official' a disclosure made by someone other than the agency from which the information is being sought."). And Members of Congress cannot

officially disclose the existence of records on behalf of DOJ because members of a separate branch of government, particularly members of the opposing party, do not speak for an executive agency. *Cf. Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982) ("[B]are discussions by this court and the Congress of NSA's methods generally cannot be equated with disclosure by the agency itself of its methods of information gathering.").

Even if the President's decision to de-classify and release the memorandum somehow transformed the statement into one of his own for purposes of this analysis, the single sentence stating that FISA was not "used to spy on [President] Trump or his campaign" does not specifically mirror the plaintiffs' FOIA request. It does not pertain to whether DOJ has records memorializing internal discussions or disclosures to the President about the President's status as a subject, target or material witness to any investigation. The fact that the DOJ withdrew its *Glomar* response as to the existence of the Carter Page FISA applications in other FOIA litigation, *see* Second Factual Suppl. at 2, is entirely irrelevant to this case.

### 9. May 1, 2018 Tweets

Plaintiffs rely on more tweets from the President as evidence of an official acknowledgment of responsive records. On May 1, 2018, between 3:47 AM and 4:45 AM, President Trump made several comments on Twitter after the *New York Times* reported on a leaked document that allegedly contained a list of interview questions that the Special Counsel sent to President Trump's lawyers:

> So disgraceful that the questions concerning the Russian Witch Hunt were leaked to the media. No questions on collusion. Oh, I see . . . you have a made up, phony crime, Collusion, that never existed, and an investigation begun with illegally leaked classified information. Nice!

Third Factual Suppl. at 2–3.[20]

> It would seem very hard to obstruct justice for a crime that never happened! Witch hunt!

*Id.* at 3.[21]

> There was no Collusion (it is a Hoax) and there is no Obstruction of Justice (that is a setup & trap). What there is is [sic] Negotiations going on with North Korea over Nuclear War, Negotiations going on with China over Trade Deficits, Negotiations on NAFTA, and much more. Witch Hunt!

*Id.*[22]

Plaintiffs argue that "[a]t a minimum, this represents an official acknowledgment that President Trump is a subject of and/or material witness to the two investigations and that the DOJ has both discussed that fact within the agency and disclosed that fact to President Trump's personal legal team." *Id.* at 3.

As stated before, an official acknowledgment cannot be based on "public speculation, no matter how widespread." *Wolf*, 473 F.3d at 378. Here again, plaintiffs admit that President Trump's exclamations were sparked by information disseminated by the press, rather than government documents, so those tweets cannot constitute an official acknowledgment.

Plaintiffs argue that the problem is cured in this situation because the President's tweets officially acknowledged the "authenticity" of the leaked questions. Pls.' Third Suppl. at 2. That is quite a stretch. The President complains that it was "disgraceful that the questions concerning

---

20    Citing, Donald Trump (@realDonaldTrump), Twitter (May 1, 2018, 3:47 AM), https://twitter.com/realDonaldTrump/status/991267863674675200.

21    Citing, Donald Trump (@realDonaldTrump), Twitter (May 1, 2018, 4:34 AM), https://twitter.com/realDonaldTrump/status/991279620044591105.

22    Citing, Donald Trump (@realDonaldTrump), Twitter (May 2, 2018, 4:45 AM), https://twitter.com/realdonaldtrump/status/991644756995444736?s=21.

the Russian Witch Hunt were leaked to the media." Other than the use of the phrase "*the questions*" (emphasis added), the tweet does not confirm or even imply that the published list is accurate. The Court is reluctant to place so much emphasis on the President's choice of a single article in a rambling set of comments issued at 4:00 in the morning.

Moreover, the D.C. Circuit has repeatedly distinguished between official acknowledgments and leaks to the media. *See e.g.*, *Afshar*, 702 F.2d at 1130–31 (distinguishing between "official acknowledgment" and "[u]nofficial leaks and public surmise"); *Fitzgibbon*, 911 F.2d at 765; *see also All Party Parliamentary Grp. on Extraordinary Rendition v. DOD*, 134 F. Supp. 3d 201, 208 (D.D.C. 2015) ("Leaked information and documents . . . do not constitute official acknowledgment."); *Judicial Watch, Inc. v. DOJ*, 898 F. Supp. 2d 93, 108 (D.D.C. 2012) ("[A]n anonymous leak is presumptively an unofficial and unsanctioned act."). Because the President's tweets are premised on a news account quoting leaked, therefore unofficial, information, they do not amount to an official acknowledgement of the existence of responsive records maintained by the DOJ and FBI.

The second and third tweets in the series are even further from official acknowledgments than the first. None of the impassioned but disjointed references to a "Witch Hunt," "setup & trap," "collusion," or "obstruction" matches the FOIA request. And the fact that the President is vociferously attacking the investigators makes the proposition that he was speaking on their behalf in this instance somewhat dubious.

### 10. June 2, 2018 Tweet

Plaintiffs also point to a June 2, 2018 tweet from President Trump:

> There was No Collusion with Russia (except by the Democrats). When will this very expensive Witch Hunt Hoax ever end? So bad for our Country. *Is the Special Counsel/Justice Department leaking my lawyers letters to the Fake News Media? Should be looking at Dems corruption instead?*

Fourth Factual Suppl., at 1 (emphasis in original).[23]

Plaintiffs characterize this tweet as being in response to yet another *New York Times* article on a leaked document, this time an alleged memorandum from President Trump's lawyer to Special Counsel Mueller. *Id.* at 2. They assert that the President's tweet confirmed the "authenticity" of the leaked legal memorandum. *Id.*

As stated before, a Presidential statement premised on unofficial information, such as a news story, is not an official acknowledgment. *See Fitzgibbon*, 911 F.2d at 765; *Wolf*, 473 F.3d at 378, citing *Afshar*, 702 F.2d at 1130. Furthermore, even if President Trump's tweet was based on official information, the specific record he mentions, a memorandum *from* his legal team to the Special Counsel, does not fall within the scope of documents sought in the FOIA request since it is not a record memorializing discussions *between* or *among* DOJ staff and the FBI, nor is it a disclosure made *to* the President or White House staff. These distinctions are not trivial; to overcome a *Glomar* response, plaintiffs must "pinpoint" disclosed records that specifically "match" the requested records, *Moore*, 666 F.3d at 1333, and here they have not done so.

## 11. September 4, 2018 *The Daily Caller* Interview

Plaintiffs have recently supplied the Court with evidence of statements the President made during a September 4, 2018 interview with *The Daily Caller*:

> I view it as an illegal investigation. It should not have never been allowed to start. *You know, I'm not a target of this investigation, just in case you don't realize.*

---

23     Citing, Donald Trump (@realDonaldTrump), Twitter (Jun. 2, 2018, 10:43 AM), https://twitter.com/realDonaldTrump/status/1002968869043097600.

Pls.' Sixth Factual Suppl. at 2 (emphasis in original).[24]  While the President uses the word "target," which is included in the FOIA request, this statement also falls short of the requirements for an official acknowledgment because among other reasons, it does not reveal the basis for the President's conclusory declaration.  He does not expressly mention a particular record maintained or disclosed by the FBI.  And to the extent, plaintiffs would argued based on the D.C. Circuit's ruling in *ACLU*, that the statement provides grounds to infer the existence of records, the statement is easily distinguished from the highly specific statements made in that case by officials of the particular agency involved.  Here the statement is quiet general, and once again the President appears to be speaking in opposition to, rather than on behalf of, the investigative agencies.[25]

---

24      Citing, *Exclusive: Trump Says 'Conflicted' Mueller is Leading 'An Illegal Investigation*,' The Daily Caller (Sept. 4, 2018), https://dailycaller.com/2018/09/04/trump-mueller-conflicted/.

25      Plaintiffs filed a notice of supplemental authority that directed the Court's attention to, *James Madison Project v. DOJ*, 17-CV-00144, 2018 WL 3956426, at *4 (D.D.C. Aug. 16, 2018), a recent *Glomar* ruling issued by another court in this district.  That opinion, which is not binding on this Court, is also distinguishable because there the court found that reconsideration was warranted because a subsequent disclosure "expressly refers to the document [p]laintiffs seek" – the two-page synopsis of the Steele dossier.  *Id.*

## CONCLUSION

Because defendant has justified its *Glomar* response through sufficiently detailed affidavits, and plaintiffs have not put forth any official statements that meet the stringent requirements to constitute a waiver, the Court will grant defendant's motion for summary judgment, and it will deny plaintiffs' cross-motion.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 7, 2018